## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lor Ler Kaw, Lor Ler Hok Koh, Mary
Jane Sommerville, and George Thawmoo,
on behalf of themselves and all others                    Case No. _____
similarly situated,

      Plaintiffs,

      v.                                            **JURY TRIAL REQUESTED**

Independent School District #625,

      Defendant.

## CLASS ACTION COMPLAINT

Plaintiffs Lor Ler Kaw ("LLK"), Lor Ler Hok Koh ("LLHK"), Mary Jane

Sommerville ("Sommerville"), and George Thawmoo ("Thawmoo"), on behalf of

themselves and all others similarly situated, state and allege as follows for their Class

Action Complaint against Independent School District #625 (the "School District").

### INTRODUCTION

1.      Plaintiffs bring this class action lawsuit seeking relief from the Court to

remedy the School District's illegal discrimination against foreign-born students who are

just beginning to learn English.  The School District's unlawful policies and practices are

depriving these English Language Learners ("ELL" or "EL") of their right to equal

educational opportunities and meaningful public education, in violation of federal civil

rights statutes, the United States Constitution, Minnesota state law, and the City of Saint

Paul's ordinances.

2.      LLK and LLHK are refugees of Karen ethnicity and Burmese nationality. Both came to Minnesota from Thailand in 2012.  LLK was 15 years old and LLHK was 12 years old.  For more than one year prior to their arrival in the United States, they had no schooling at all.  They had learned limited English from teachers with extremely limited English, and were barely literate in their own language given the difficult circumstances that they endured.  Upon their arrival in the United States, they, for the first time, received school books and had the opportunity to attend school every day.

3.      LLK and LLHK are ELL students who are entitled to an equal and meaningful opportunity to participate in public education under federal, state, and local law.  This requires public school districts to take affirmative steps to address language barriers for ELL students.

4.      Unfortunately, however, the School District has implemented policies and practices that have forced LLK, LLHK, and other immigrant students with limited English proficiency to attend "mainstream" classes, where they do not receive sufficient and effective language instruction.  For example, at the time of the 2014-2015 school year, LLK was reading at a second-grade level.  But the School District scheduled him in mainstream eleventh-grade English and Social Studies classes, sitting side-by-side with mainstream students who speak English fluently and who had nine or ten years of consistent, formal education.  The School District scheduled him for classes to read American literature and perform advanced analyses when he was reading at a second-grade level and just beginning to acclimate to formal schooling.  After being thrown into mainstream classes like Biology, English, and Economics, his ability to learn the content

2

of the courses was impaired because they exceeded his English level.  LLHK, similarly, has been placed in mainstream core content courses where his ability to learn the course content was impaired because they exceeded his English level.

5.     The School District's mainstreaming policies have denied LLK and LLHK, and others similarly situated, the ability to learn in a language they understand and, ultimately, the ability to become productive members of society.

6.     Plaintiffs also bring this action to address the School District's discriminatory practices with respect to special education and disability services for ELL students.  Like all other students, ELL students are entitled by federal and state law to screening for special educational services and reasonable accommodations for disabilities.  Contrary to this obligation, the School District has implemented practices that improperly consider students' national origin in determining eligibility for special educational services or accommodations, and fail to accommodate students with disabilities by refusing to evaluate them, refusing to reimburse parents for the cost of evaluations they were required to obtain on their own, and causing significant and unreasonable delay in providing the necessary accommodations.

7.     LLHK, for example, was not screened for a learning disability until his parents, Thawmoo and Sommerville, obtained – at their own expense – a medical evaluation and threatened the School District with legal action.  Despite a medical diagnosis, the School District repeatedly refused to conduct an evaluation.  While it eventually performed evaluations because of Sommerville's and Thawmoo's substantial efforts on LLHK's behalf, it still refused to recognize that LLHK qualified for special

education services.  The School District improperly and unreasonably delayed providing LLHK with disability services to which he is entitled for over *14 months*.

8.      Following an extensive and impartial investigation – including sworn testimony and witness interviews – the City of Saint Paul Human Rights Division determined that "probable cause exists to believe that [the School District] unlawfully discriminated against [LLHK]."  The findings were based on the School District's discriminatory practices with respect to ELL students, and ELL students with disabilities.

9.      The City of Saint Paul's Memorandum of Findings ("MOF") is attached as Exhibit A, and incorporated by reference.  Specifically, the City of Saint Paul concluded:

> The evidence shows probable cause that the [School District] discriminated against the [LLHK] because of his national origin for failing to offer effective instruction that he and other Karen students needed.  As a result, the [School District] deny[ed] him the equal opportunity to benefit from his education that was offered to mainstream students.
>
> The evidence also shows probable cause that the [School District] improperly considered [LLHK's] national origin in determining his eligibility for special education services or accommodations.  The [School District's] discriminatory treatment of [LLHK] resulted in significant delays in evaluating whether [LLHK] required special education services or accommodations for his disability.
>
> There is also probable cause that the [School District] failed to accommodate [LLHK] by refusing to evaluate him for a disability, suggesting his parents pay for a medical evaluation and not compensating them for the cost, and causing a significant and unreasonable delay in providing him the necessary accommodations.

(Ex. A, MOF, Page 38 of 39.)

10.    In addition, the Minnesota Department of Education ("MDE") recently issued a report, attached as Exhibit B, finding that the School District's ELL program was not in compliance in numerous different ways.  *Elementary and Secondary Education Act (ESEA): Title III Monitoring Review Compliance Report*, Saint Paul Public School District, Minn. Dep't of Educ. (January 17, 2017).  For instance, it found that:

a.    Effective implementation of ELD [English Language Development] standards is inconsistent across the School District;

b.    Students assessed at certain English language levels were not served at all sites;

c.    The School District submitted no evidence that evaluation of the EL [English Learner] program has been done; and

d.    Identification of special education needs for EL students is inconsistent and often delayed, which may "contribute to delayed progress in all academic areas."

(Ex. B, MDE Report, pp. 3-4.)

11.    As detailed further below, on behalf of themselves and other members of the classes they seek to represent, Plaintiffs request that the Court enter declaratory and injunctive relief, including a preliminary injunction, to cease the School District's illegal, improper, and discriminatory practices toward immigrant ELL students.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343.

13.    This Court has jurisdiction to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     This Court may exercise supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the School District resides in the District of Minnesota and the events that gave rise to this action occurred within the District of Minnesota.

**FACTUAL BACKGROUND**

16.     Through this reference, Plaintiffs incorporate the extensive and detailed Findings of Fact set forth in the City of Saint Paul Human Rights Division's Memorandum of Findings, attached as Exhibit A.

**A.     The Parties**

**1.     Plaintiff LLK**

17.     LLK is a Karen refugee.

18.     The Karen have traditionally resided in the southern and southeastern parts of Burma (Myanmar).  Since the mid-twentieth century, the Karen have been embroiled in an ongoing conflict with the military regime currently controlling Myanmar.

19.     As a result of this conflict – when he was four months old – LLK and his father (Thawmoo) were forced to flee their home to escape killings, torture, rape, landmines, forced labor, and other atrocities committed by that country's military regime. They took sanctuary in Thailand, where they lived in refugee camps and temporary housing for years.

20.    LLK grew up speaking Karen and some Burmese.  He received sporadic education while living in Thailand, often from teachers who were not qualified and lacked necessary skills and materials.

21.    In October 2012, LLK resettled in the United States.

22.    LLK had little exposure to the English language prior to arriving in the United States, and he did not know any English when he arrived.  He did not receive any schooling in the previous two years before arriving in the United States.

23.    LLK is a student with Limited or Interrupted Formal Education (SLIFE).[1] SLIFE learners like LLK have no or very limited prior education, literacy in any language, English proficiency, and are typically refugees.  SLIFE learners need to acquire basic academic skills and literacy in order to learn the required material.  This is because the older a student is at the onset of literacy and schooling, the longer it takes to acquire English and academic proficiency, and the harder it is to acquire the skills and the greater the need for customized instruction.

24.    LLK has been an ELL student within the School District since he arrived in the United States, and he still is today.

---

[1] Minnesota defines SLIFE as an English learner with interrupted formal education who (1) comes from a home where the language usually spoken is other than English, or usually speaks a language other than English, (2) enters school in the United States after grade 6, (3) has at least two years less schooling than the English learner's peers, (4) functions at least two years below expected grade level in reading and mathematics, and (5) may be preliterate in the English learner's native language.  Minn. Stat. § 124D.59, subd. 2a.

25.     LLK is currently matriculated at Como Park Senior High School ("Como Senior High"), which is a high school within the School District.  When school starts in the fall, LLK will be a twelfth grader.

26.     As a Karen refugee, LLK is a member of a protected class on the basis of national and ethnic origin.

**2.     Plaintiff LLHK**

27.     LLHK is LLK's brother.  He is also a Karen refugee.

28.     LLHK was born and lived for several years in Thailand, where his father (Thawmoo) and older brother (LLK) had fled to escape the atrocities committed by the military regime in control of their home country.

29.     Like his brother, LLHK grew up speaking Karen and some Burmese.

30.     In October 2012, LLHK resettled in the United States.

31.     LLHK had little exposure to the English language prior to arriving in the United States, and he did not know any English when he arrived.  He did not receive any schooling in the previous two years before arriving in the United States.

32.     Like his brother, LLHK is also a SLIFE learner.  LLHK received sporadic education while living in Thailand, often from teachers who were not qualified and lacked necessary skills and materials.

33.     Today, LLHK reads English at a fourth-grade level, and reads fourth-grade level books from the children's section.

34.     LLHK is an ELL student within the School District.

35.    In addition, LLHK has been diagnosed with a learning disability, specifically Attention Deficit Disorder-Inattentive Type and Adjustment Disorder with Mixed Anxiety/Depression.

36.    LLHK is matriculated at Como Senior High.  When school starts in the fall, LLHK will be an eleventh grader at Como Senior High.

37.    As a Karen refugee, LLHK is a member of a protected class on the basis of national and ethnic origin.

**3.    Plaintiffs Thawmoo and Sommerville**

38.    Thawmoo, also a Karen refugee, is the father of LLK and LLHK.

39.    Sommerville is married to Thawmoo, and is LLK's and LLHK's stepmother.

40.    Sommerville and Thawmoo are actively involved in LLK's and LLHK's education.  They have incurred significant time, effort, and expense in obtaining equal educational opportunities for their children, only to have the School District repeatedly ignore, refuse, and improperly delay their requests.  For example, they have spent large amounts of time organizing meetings or otherwise communicating with teachers, school counselors, assistant principals, principals, assistant superintendents, school board members, academic officers, the Karen Parent Advisory Council, the PACER Center, and others to address the School District's improper treatment of ELL students within the School District.

41.    Thawmoo and Sommerville have spent their own money as a result of the School District's conduct, including, for example, money on medical evaluations insisted

upon by the School District and supplemental tutoring for their sons to try to remedy the lack of proper education being provided by the School District.

42.    Sommerville and Thawmoo have also suffered significant and continuing distress seeking proper educational services for LLK and LLHK.

43.    On April 13, 2015, on behalf of her minor stepson LLHK, Sommerville filed a Charge of Discrimination with the Saint Paul Department of Human Rights & Equal Economic Opportunity, Human Rights Division asserting national origin and disability discrimination by the School District.  The findings attached at Exhibit A, issued over two years later, are the culmination of that effort.

### 4.    The School District

44.    The School District is a school district within the State of Minnesota organized pursuant to Minn. Stat. ch. 123B.  The School District's headquarters are at 360 Colborne Street, Saint Paul, Minnesota 55102.

45.    As a public entity, the School District receives federal funds.

46.    The School District is a Local Educational Agency ("LEA") responsible for ensuring that students receive an education consistent with federal and state law.

47.    The School District is also required to comply with state educational laws.

48.    The School District is a State actor and, at all relevant times, acted under color of state law as defined by 42 U.S.C. § 1983.

**B.    Legal Framework**

**1.    Federal Requirements**

49.    The United States Supreme Court has recognized that "[b]asic English skills are at the very core of what [] public schools teach." *Lau v. Nichols*, 414 U.S. 563, 567 (1974).  The Supreme Court has held that school districts must take affirmative steps to ensure that students learn sufficient English skills to have a meaningful opportunity to participate in a district's educational program.  *Id.*  "[T]here is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; *for students who do not understand English are effectively foreclosed from any meaningful education*."  *Id.* at 566 (emphasis added).

50.    Numerous federal laws provide that students with limited English proficiency are entitled to equal access to all public school programs and services offered by their school districts.  The Equal Educational Opportunities Act ("EEOA") provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her … national origin, by … the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs."  20 U.S.C. § 1703(f).  Title VI of the Civil Rights Act of 1964 ("Title VI") prohibits recipients of federal financial assistance, including school districts, from discriminating on the basis of national origin and requires school districts to take "affirmative steps" to address language barriers so that ELL students can participate meaningfully in educational programs.  *See, e.g.*, 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *Lau*, 414 U.S. at 566-67; 34 C.F.R. § 100.3.

51.    Federal law also requires that ELL students who may have a disability be located, identified, and evaluated for special education and disability-related services in a timely manner. *See, e.g.*, 20 U.S.C. §§ 1400-1419 (the Individuals with Disabilities Education Act ("IDEA")); 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1973 ("Section 504")).

52.    The Office for Civil Rights (OCR) at the U.S. Department of Education and the Civil Rights Division at the U.S. Department of Justice (DOJ) share authority for enforcing Title VI in the education context.  DOJ is responsible for enforcing the EEOA. OCR and DOJ also share authority for enforcing Section 504 in the educational context, while the Department of Education's Office of Special Education Programs administers the IDEA.  In January 2015, OCR and DOJ issued joint guidance to assist school districts and others in meeting their legal obligation to ensure that ELL students can meaningfully and equally participate in educational programs and services ("Joint Guidance").[2]  The Joint Guidance is attached as Exhibit C.

53.    The Joint Guidance identifies several areas that "frequently result in noncompliance" in meeting a school district's obligations to ELL students, including:

---

[2]  *See* Catherine E. Lhamon & Vanita Gupta, United States Department of Justice & United States Department of Education, *Dear Colleague Letter: English Learner Students and Limited English Proficient Parents,* pp. 1, 24 (Jan. 7, 2015), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-el-201501.pdf.

a.    Failure to provide EL students with a language assistance program that is educationally sound and proven successful;

b.    Failure to monitor and evaluate EL students in language assistance programs to ensure their progress with respect to acquiring English proficiency and grade level core content, exit EL students from language assistance programs when they are proficient in English, and monitor exited students to ensure they were not prematurely exited and that any academic deficits incurred in the language assistance program have been remedied;

c.    Failure to evaluate the effectiveness of a school district's language assistance program(s) to ensure that EL students in each program acquire English proficiency and that each program was reasonably calculated to allow EL students to attain parity of participation in the standard instructional program within a reasonable period of time; and

d.    Failure to ensure that EL students with disabilities under the IDEA or Section 504 are evaluated in a timely and appropriate manner for special education and disability-related services and that their language needs are considered in evaluations and delivery of services.

(Ex. C, Joint Guidance, pp. 8-9.)

54.    The Joint Guidance further relates that:

To provide appropriate and adequate EL program services based on each EL student's individual needs, and to facilitate transition out of such services within a reasonable time period, a school district will typically have to provide more EL services for the least English proficient EL students than for the more proficient ones. In addition, districts should provide designated English Language Development (ELD)/English as a Second Language (ESL) services for EL students at the same or comparable ELP levels to ensure these services are targeted and appropriate to their ELP levels.

(*Id.*, p. 13.)

13

55.    The Joint Guidance explains that compliance issues arise when school districts: (i) exclude EL students with scheduling conflicts from the EL program; (ii) supplement regular education instruction with only aides who tutor EL students as opposed to teachers adequately trained to deliver the EL program; (iii) fail to offer a program to a certain subset of EL students, such as students with disabilities or students speaking particular languages; (iv) stop providing language assistance services when EL students reach higher levels of English proficiency but have not yet met exit criteria (including proficiency on a valid and reliable ELP assessment); or (v) fail to address the needs of EL students who have not made expected progress in learning English and have not met exit criteria despite extended enrollment in the EL program.  (*Id.*, p. 14.)

56.    The Joint Guidance provides that school districts must also adequately monitor and exit EL students from EL programs and services.  (*Id.*, pp. 32-35.) Compliance issues arise when school districts: (i) exit intermediate and advanced EL students from EL programs and services based on insufficient numbers of teachers who are qualified to deliver the EL program; and (ii) prematurely exit students before they are proficient in English, especially in the specific language domains of reading and writing. (*Id.*, p. 34.)

57.    In addition, school districts must evaluate the effectiveness of their EL programs for compliance.  As the Joint Guidance explains:

> Generally, success is measured in terms of whether the particular goals of a district's educationally sound language assistance program are being met without unnecessary segregation.  As previously discussed, those goals must include enabling EL students to attain within a reasonable

> period of time, both (1) English proficiency and (2)
> meaningful participation in the standard educational program
> comparable to their never-EL peers. The Departments will
> not view a program as successful unless it meets these two
> goals.

(*Id.*, p. 35.)

58.    With respect to disability screening and accommodations, the Joint

Guidance explains that school districts must "ensure that all EL students who may have a

disability, like all other students who may have a disability and need services under

IDEA or Section 504, are located, identified, and evaluated for special education and

disability-related services in a timely manner." (*Id.*, p. 24.) Under IDEA, a school

district must also implement education programs that meet the student's language and

special education needs. (*Id.*, pp. 26-27.) Parents must also be informed of, and

consulted regarding, these programs. (*Id.*, pp. 24-27.)

59.    Compliance issues surrounding disability services include when school

districts: (i) deny English language services to EL students with disabilities; (ii) evaluate

EL students for special education services only in English when the native and dominant

language of the EL student is other than English; (iii) fail to include staff qualified in EL

instruction and second language acquisition in placement decisions under the IDEA and

Section 504; or (iv) fail to provide interpreters to LEP parents at meetings to ensure that

LEP parents understand the proceedings. (*Id.*, p. 29.)

60.    In particular, the Joint Guidance identifies that a practice of delaying

disability evaluations of EL students for special education and related services for a

specified period of time based on their EL status, or allowing students to have *either* EL

or disability services but *not both*, are "impermissible under the IDEA and Federal civil rights laws." (*Id.*, p. 25.)

### 2. State Requirements

61.     Education is a fundamental right under the Minnesota Constitution. *See* Minn. Const. art. XIII, § 1 ("The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state."); *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993) ("[W]e hold that education *is* a fundamental right under the state constitution, not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate.") (emphasis in original).

62.     Public schools in Minnesota are free to any resident of the district up to age 21. Minn. Stat. § 120A.20, subd. 1.

63.     State law sets out certain minimum requirements for ELL programs in Minnesota. *See*, *e.g*., Minn. Stat. § 124D.61; 2014 Minn. Laws ch. 272 (Learning English for Academic Proficiency and Success Act ("LEAPS")).

64.     The MDE administers the state's ELL program. In 2011, the MDE joined the World-Class Instructional Design and Assessment ("WIDA") Consortium, which advances social, instructional, and academic language development and achievement for linguistically diverse students. *See English Language Education in Minnesota*, Fall 2016 Report, Minn. Dep't of Educ.

65.    Minnesota has adopted the WIDA English Language Proficiency ("ELP") standards and the ACCESS for ELLs 2.0 (Assessing Comprehension and Communication in English State-to-State for English Language Learners) as the annual state English Language Proficiency Assessment.  (*Id.*, p. 6.)

66.    ACCESS for ELLs has six levels of proficiency, starting from an entry level for students who have few English language skills (Level 1) to the final level (Level 6) at which students are deemed proficient.  (*Id.*, p. 6.)

67.    Under these standards, at the end of Level 2, students should achieve skills like comprehension of compound grammatical constructions and speaking in phrases or short sentences.  At the end of Level 3, students should achieve skills like listening to or reading a series of extended sentences and speaking and writing with short and some expanded sentences with emerging complexity.  (*Id.*, pp. 8-9.)

## C.    The School District's Discriminatory ELL Policies and Practices

68.    As set forth below, in or around the middle of the 2013-2014 school year, the School District implemented policies and practices that transitioned ELL students at all levels into mainstream classes where they were not provided the language resources they needed to succeed.  LLK, LLHK, and other immigrant and refugee students like them, including SLIFE students, could not keep up in classes taught predominantly in English, and began to fall behind.  The School District graduated ELL students even though their language skills remained at grade-school levels, and they could not succeed at any two-year college without additional remedial English instruction.  As a result,

LLK, LLHK and others similarly situated have been and continue to be denied an equal opportunity to education, and have suffered and continue to suffer harm.

### 1.    The School District's Change to "Mainstreaming" ELL Students

69.    Midway through the 2013-2014 school year, the School District made a drastic change as to how it taught ELL students.  At that time, it decided to mainstream ELL students.  Some Level 1 and Level 2 students were placed in mainstream classes. Level 3 and Level 4 students – who were improperly grouped together despite having different educational needs – were required to move from their sheltered ELL classes into mainstream classes regardless of whether the students were ready for mainstream instruction.  Level 5 students were released to mainstream classes without support or monitoring.

70.    When the School District introduced this new and dramatically different policy, the then Assistant Superintendent of the Multilanguage Learner Program stated: "How can students succeed if they don't fail?"  (Ex. A, MOF, Page 10 of 39.)  That statement demonstrates that the School District expected ELL students to fail.

71.    The School District's Assistant Superintendent at the time also accused ELL teachers of "coddling" the ELL students.  She has cited an example of a high school ELL classroom using "Twinkle, Twinkle Little Star" as an example of "coddling."  (*Id.*)

72.    The School District did not notify parents of this change to its policy before it was implemented.  Instead, parents of ELL students learned of the change when the teachers informed them their students would be moved to mainstream classes in early 2014.  Further, the School District's Superintendent wrote a letter about the change only

after it had already been implemented.  Parents were notified of the change after the

open-enrollment application process had closed.

73.    The City of Saint Paul Human Rights Division determined that the School

District's policy change was "clear and memorable," stating:

> [T]he evidence clearly shows that midway through the 2013-
> 2014 school year, ELL students that were in sheltered classes
> in the Fall of 2013, were shifted to mainstream classes the
> next quarter in 2014.  The evidence shows that this was a
> clear and memorable change because of the sudden shift
> between quarters was not what students, parents, or teachers
> were expecting or prepared for.

(Ex. A, MOF, Page 32 of 39.)

74.    The City of Saint Paul further determined that this change was not

compliant with state or federal law:

> The switch to mainstreaming ELL students included a heavy
> reliance on co-taught classes which included a mainstream
> teacher and an ELL teacher, sometimes would include
> English Language Development support, but sometimes it
> would not.  Sometimes Level 3 students are in a core content
> class and receive no ELL services; there is only a mainstream
> teacher and no additional supports.  The MLL Department
> controls the funding for the ELL program.  Evidence shows
> that the School District allowed each principle [sic] to
> determine the schedule and staffing for ELL classes and that
> budget was a primary consideration.  This practice has been
> specifically identified as noncompliant with applicable Civil
> Rights Laws.

(*Id.*)

75.    The City of Saint Paul concluded that the School District implemented its

mainstreaming policy without having a method to identify students who were struggling

in mainstream classes, without a plan to evaluate the effectiveness of its mainstreaming

approach, and without attempting to compare the progress of ELL students before the mainstreaming policy with the progress of ELL students after the mainstreaming policy. (*Id.*, Pages 32-33 of 39.)

### 2.    The Effect of the School District's Noncompliant Mainstreaming Policy

76.    When he arrived in the United States, LLK was enrolled in Como Senior High as a freshman.  He was placed in ELL Level 1 for the 2012-2013 school year.  For the 2013-2014 school year, he was at ELL Level 2.  For the first two years, he was primarily enrolled in ELL supported classes, where he received As, Bs, and a small number of Cs.

77.    In contrast, for the 2014-2015 school year, the School District placed LLK into mainstream classes as a Level 3 ELL student.  In addition to classes like biology and economics, the mainstream classes included eleventh-grade English and Social Studies classes, which have heavy reading requirements that are very difficult for students whose English is not at the same reading level.  By way of example, by spring of 2014, LLK had only learned limited English starting two years earlier, was reading at a second grade level, and was consequently reading level-appropriate books from the children's section. The eleventh-grade English curriculum includes studying American literature and performing advanced research and analyses (such as in-depth study of irony and sarcasm).

78.    LLK's ability to learn the content of his classes was impaired when the School District put him in mainstream classes because the classes exceeded his English level, which is demonstrated by the fact that his grades suffered significantly.  Whereas

he had previously achieved As, Bs, and a small number of Cs, LLK began receiving Ds (for the first time since he arrived in the United States) and many Cs because the classes were above his English level.

79.    The following year, Sommerville and Thawmoo requested that LLK be held at ELL Level 3 in light of these difficulties.  However, the School District continued to place him in mainstream classes.  Despite retaking biology, he did not perform well or understand the content.  He failed Algebra 2.

80.    LLK's brother, LLHK, was also harmed by the School District's mainstreaming policy.  When he first arrived in the United States, LLHK attended a middle school in Roseville, outside the School District.  There, he was enrolled in a Level 1 ELL course.  His class size was approximately 17 students, he received one-on-one instruction, and he performed at an average level.

81.    In 2013, LLHK enrolled as a ninth grader at Como Senior High, a school within the District.  He was placed in ELL Level 2 classes and, at least initially, was provided additional support services and kept out of mainstream courses.

82.    In the first quarter of 2014, while in ELL Level 2, LLHK was mainstreamed in two out of seven courses.  Like his older brother, LLHK had difficulty understanding his mainstream instructors and course materials.  He did not perform well, and was not receiving adequate ELL services or the individual support he needed to have a meaningful education.

83.    The sudden transition to mainstream classes was very hard on many students, including LLK and LLHK.

84.    Since the School District's mainstreaming policy came into effect, Level 3 ELL students in mainstream classes have achieved lower grades than ELL classes teaching the same content.

85.    Moreover, mainstream teachers have been giving ELL students passing grades, even though they lack proficiency in the subject matter and their work does not merit a passing grade.  This was based, in part, on mainstream teachers who perceived that Karen ELL students, who generally do not speak up or say much, had good behavior and work ethic.

86.    As a result, many ELL students at high school graduation do not have basic language skills.  Some ELL students graduate with a below sixth-grade reading level. Other ELL students who are not on track to graduate in four years have been encouraged to transfer to another school or an Alternative Learning Center so that the public school can maintain graduation rates, even though they are allowed to attend public school until they turn 21 years old.

87.    Mainstreaming has also had an adverse impact on ELL students' postsecondary school opportunities.  Even though they technically pass and can graduate, in general, students with a C- average are not ready for a two-year college.  Karen ELL students in postsecondary education have been forced to spend the first two years of their education focusing on continuing language development, before they can focus on content classes.  These students use up their PELL grant funds on remedial English classes and do not receive college credit for these classes.  Karen ELL students that

graduated under the previous instruction model were reported to perform better in post-secondary system than those that were mainstreamed across the board at Level 3.

88.    The City of Saint Paul determined that mainstreaming at ELL Level 3 is "not effective for many Karen students who had limited formal education." It noted how the School District's policies have negatively affected these ELL students:

> The ELL services do not provide Karen students, including [LLHK], a meaningful opportunity to participate in the [School District's] academic program to the same extent as mainstream students. The [School District] also does not provide a dual-language ELL program in Karen that is available to Hmong and Spanish-speaking students. Simply moving the Karen students in the mainstream courses without monitoring has been insufficient to ensure meaningful participation. Particularly when there have been numerous and consistent reports that Karen students have not been able to access the curriculum and their learning needs have been overlooked because as a group, they tend to be quiet, respectful and cooperative.

(Ex. A, MOF, Page 33 of 39.)

89.    In addition, compared to ELL classes, ELL students in mainstream classes do not receive the same level of individual attention and skill development to be able to progress with English language skills.

### 3.    The School District's Refusal to Address the Consequences of Mainstreaming Despite Findings of Discrimination

90.    The impact of the School District's mainstreaming policy on ELL students, including the Karen refugee students, was repeatedly brought to the School District's attention.

91.    The topic was frequently raised at the Professional Issues Committee ("PIC").  Teachers in the School District identified issues with Karen students in mainstream classes, including that they acquired English at a slower rate, adopted coping strategies to get passing grades (including copying other students), were being passed by mainstream teachers even though they had not learned the material, and needed to take remedial English classes at post-secondary schools for a year or more before they were ready for post-secondary courses.  School District staff attended PIC meetings, so the School District knew of these complaints.

92.    At the PIC meetings and through other communications, the School District was informed that many SLIFE students, because of their limited formal education, still needed to master basic literacy skills that other students would have learned early on in their education.  Therefore, the School District was informed that the mainstreaming policy was not appropriate for a significant number of SLIFE students, who are at an elementary English level and are expected to keep up in high school level English, Social Studies, and literacy-intensive classes.

93.    Concerns were also being voiced in the Karen community.  The Karen Parent Advisory Council received an "outpouring of calls from Karen parents expressing their concern about the struggle their children are experiencing in the classroom due to the changes [in ELL-Levels] in secondary schools."  (Ex. A, MOF, Page 16 of 39.)  At council meetings, parents shared concerns that the mainstreamed students were not able to understand the curriculum, and were graduating without the English skills they needed to succeed.

94.     Thawmoo and Sommerville raised specific concerns with the School District regarding LLK and LLHK's placement in mainstream classes.  Sommerville repeatedly expressed serious concerns to LLK's and LLHK's teachers and counselors that they were not understanding the content of their classes (getting lower grades in mainstream classes), and identified the challenges that they faced in learning in a new environment and culture.

95.     Sommerville wrote a detailed letter to the Saint Paul School Board outlining her concerns.

96.     In response to such complaints, the School District's Assistant Superintendent responded:  "I can't isolate any longer and drill to kill in grammar."  (Ex. A, MOF, Pages 17 and 21 of 39.)

97.     Because the School District refused to address the problem, LLHK began repeating EL levels in 2014-2015 and LLK began repeating EL levels in 2015-2016 in an attempt to get language development support they needed.  Thawmoo and Sommerville were concerned that with limited or no support offered in co-taught classes, their children would not receive effective instruction to grasp core concepts.

98.     Concerns regarding the School District's mainstreaming policies continued to mount throughout the 2014-15 school year.

99.     At an October 9, 2014, ELL PIC meeting, a teacher reported that twelfth-grade ELL students were going to graduate with only a second- or third-grade level of English, but would have learned more if they were in an ELL Level 3 class.  (Ex. A, MOF, Page 22 of 39.)

100.    At a Karen Parent Advisory Committee meeting on November 7, 2014, parents expressed concerns about their students being mainstreamed, being unable to understand the curriculum, and graduating without the necessary English skills to access postgraduate opportunities without first having remedial English classes.  (*Id.*, Page 25 of 39.)

101.    At a December 16, 2014, meeting, Sommerville presented a petition with 512 signatures from School District students, parents, faculty, staff, and community members regarding concerns about the School District's mainstreaming policy.  She reported that students in the School District were being rushed into mainstream classes and were not being provided the necessary support.  She further noted that the pedagogy employed by the School District for ELL students was not research-based.  (*Id.*, Page 27 of 39.)

102.    On April 13, 2015, Sommerville filed a charge of discrimination with the City of Saint Paul asserting national origin discrimination based on the School District's new "mainstreaming" policy.  On May 5, 2017, after a multi-year investigation, the City of Saint Paul Human Rights Division determined that "the evidence shows probable cause that the [School District] discriminated against [LLHK] because of his national origin."  (*Id.*, Page 38 of 39.)

103.    As recognized by the City of Saint Paul, despite ample knowledge regarding the adverse effects of the mainstreaming policy, the School District has failed to ensure that Karen ELL students are provided a meaningful educational opportunity, and failed to even implement methods to evaluate its change in policy:

> Even though the [School District] knew or should have
> known that Karen students would be particularly vulnerable
> to struggle under the mainstreaming policy, the [School
> District] has not made any efforts to ensure that Karen
> students would not be left behind.  Moreover, although
> evaluation is required, the [School District] has had no plan to
> evaluate its mainstreaming approach, even as it has been
> learning of serious consequences for Karen students.

(*Id.*, Page 33 of 39.)

104.    In January 2017, after an audit that involved more than 100 witness

interviews and a comprehensive policy review, the MDE issued a report regarding the

School District's ELL policies.  Many of its findings confirmed concerns that had been

raised by Thawmoo and Sommerville along with other members of the community.  (*See*

*generally* Ex. B, MDE Report.)

105.    Regarding the quality of the School District's language instructional

educational programs for ELL students, the MDE Report made the following finding:

> Finding 2.1.1:  The [School District] provided evidence that
> effective implementation of ELD standards is inconsistent
> across the district.  While evidence provided demonstrates
> some training on the ELD standards, other evidence reveals
> that few people received such training.  Secondary-level
> syllabi provided in the evidence binder do not demonstrate
> understanding of ELD standards implementation.

(Ex. B, MDE Report, p. 3.)

106.    The MDE Report found a lack of evidence that the School District

evaluated the programs and activities to determine effectiveness:

> Finding 2.3.1:  No evidence was provided that evaluation of
> the EL program has been done.

(*Id.*, p. 4.)

27

107.    The MDE Report found that the School District failed to provide consistent services to students at or above Level 3:

> Recurring Finding 2.5.1:  Evidence was provided that students assessed at WIDA levels 3-5 are not served at all sites.

(*Id.*)

108.    The MDE Report found that there was a lack of appropriate licensure and qualifications of ELL teachers in the School District.  (*Id.*, p. 5 ["Evidence was provided that some teachers of Sheltered Content courses are not appropriately licensed."]; *id.* ["Little evidence was provided to support that core content teachers and administrators receive EL training ….  training around EL education does not include professional development directly relevant to culturally responsive pedagogy that enables students to master content, develop skills to access content, and build relationships."].)

109.    Although the School District is aware of the adverse impacts of its mainstreaming policies and practices, the School District continues to mainstream ELL students at Level 3 and fails to otherwise provide full and proper services to ELL students to overcome their language barrier.

110.    The School District's policies and practices have harmed, and continue to harm, Plaintiffs and members of the class.

**D.    The School District's Improper Disability Practices**

111.    As set forth below, the School District has an improper practice of refusing or delaying evaluations for ELL students who are referred for special education services as a result of a suspected disability.

1.      **The School District's Failure to Evaluate or Accommodate LLHK's Disability**

112.    In late 2013, Sommerville first approached the School District with concerns that LLHK's academic performance may have been suffering due to a medical condition.  She explained that he was having challenges in organization and understanding and completing his schoolwork.  She shared her concerns that this may have been caused by a disability.

113.    When Sommerville first contacted the School District, Sommerville and Thawmoo were not provided an overview of the process or options for accommodations available for LLHK.  For instance, the School District did not inform Sommerville or Thawmoo that there were two separate avenues to receive accommodations or special education services – a special education process and a Section 504 accommodation process.  As a result, Thawmoo and Sommerville did not know that there was a Section 504 accommodation process or that it would be faster and easier to qualify for accommodations through this option.  (Ex. A, MOF, Page 38 of 39.)

114.    On multiple occasions through late 2013 and early 2014, Sommerville requested from the School District special education testing and immediate steps to help LLHK.  Instead of offering options for LLHK or evaluating him for a disability, the School District instructed Sommerville to schedule an appointment with his physician to determine whether there was a diagnosis.

115.    Sommerville and Thawmoo were forced to use their own insurance and funds for LLHK's medical evaluation.  The School District did not offer to reimburse them for these costs.

116.    Four months after LLHK's parents first requested an evaluation by the School District, LLHK's medical provider diagnosed him with Attention Deficit Disorder — Inattentive and Adjustment Disorder with Mixed Anxiety/Depression.  His physician noted that this diagnosis "appear[s] to be causing [LLHK's] significant academic impairment."  (Ex. A, MOF, Page 16 of 39.)  His physician recommended that LLHK's parents request comprehensive school assessment and an evaluation to determine whether he qualified for an IEP.

117.    Sommerville promptly informed the School District of the diagnosis and recommendation and requested a special education evaluation be performed in the same school year, so that LLHK could obtain the necessary accommodations that year and during summer school.

118.    Despite knowledge of LLHK's diagnosis and medical recommendations, the School District refused to perform the special education evaluation.  The School District also rejected pursuing a Section 504 Plan.

119.    The School District's decision to deny special education evaluation was based on the erroneous conclusion that LLHK was performing at average levels at Como Senior High, and had performed well at his middle school in a different district.  The School District did not consider: (i) that Thawmoo and Sommerville (who is a native-English speaker) were spending a considerable amount of time assisting LLHK with

homework and organizing his materials; (ii) that two of his teachers had made informal

accommodations for him; or (iii) that LLHK's "average" grades were achieved in middle

school, where he was in a school with smaller class sizes and more one-on-one attention,

and tools and instruction to help him stay organized (the exact accommodations that he

needed on a going-forward basis).  (*See* Ex. A, MOF, Page 36 of 39.)

120.    As part of its justification for denying LLHK a special education

evaluation, the School District noted that he had only been in the country for one year.

121.    The School District's 2013-2014 checklist for determining whether a

referral for special education is appropriate includes the student's length of time in the

United States and/or education history.  (Ex. A, MOF, Page 11 of 39.)

122.    The City of Saint Paul Human Rights Division specifically determined that

LLHK's status as an ELL student contributed to the School District's decision to initially

reject conducting a special education evaluation.  (*Id.*, Pages 34-35 of 39.)

123.    Nevertheless, Thawmoo and Sommerville, on LLHK's behalf, persisted in

their request for special education evaluation and accommodations.  After they informed

the School District that they were considering legal action, the School District finally

agreed to perform a special education evaluation.

124.    The evaluation, which began in May 2015, took more than three months.

LLHK's teachers observed that he had difficulty with fidgeting, easy distraction, trouble

paying attention, organization, and other characteristics.  The evaluation, however, only

observed his performance in math class.  The School District's September 9, 2014,

Evaluation Report found that LLHK's academic performance was lower than his siblings,

that he had difficulty understanding directions, that he needed assistance from his stepmother to understand the directions, that he needed assistance completing his homework, that he often became distracted when doing homework, and that he needed reminders to direct his attention back to his homework. The report notes that LLHK performed better after being transferred to a smaller ELL class and when receiving individualized attention. Nevertheless, the Evaluation Report concluded that LLHK still did not demonstrate a need for special educational services.

125.    Because the School District refused to evaluate LLHK for special education services when Thawmoo and Sommerville first requested them in November 2013, LLHK attended the second half of the 2013-2014 school year and a semester of summer school, without accommodations. During this time, and despite the pendency of the request for evaluation, the School District did not explore possible accommodations, even once it became clear that the evaluation would be postponed over summer break.

126.    Because the Evaluation Report was based on observations from LLHK's math class, Thawmoo and Sommerville requested a new evaluation to review his performance in all classes. The School District ultimately conducted a second evaluation, and a report was issued in October 2014, when LLHK was in tenth grade. The report indicated that LLHK was diagnosed with Attention Deficit Disorder — Inattentive Type and Adjustment Disorder with Mixed Anxiety/Depression. Nevertheless, it remarkably determined that LLHK still did not meet the eligibility requirements for an educational disability.

127.    Finally, more than one year after Sommerville first requested accommodations, in late 2014, the School District offered to prepare a Section 504 plan for LLHK.

128.    On January 16, 2015 – more than one year after Sommerville requested a special education evaluation – the School District's Section 504 evaluation team concluded that LLHK had a mental impairment of ADD/ADHD, which substantially limits a major life activity of learning and concentrating.  The evaluation team concluded that the LLHK's ADD limits him at school due to distractions and the inability to concentrate and focus without accommodations.  The team concluded that he met eligibility standards to be identified as having a Section 504 disability, and required reasonable accommodations.

129.    The requested accommodations were not provided until 14 months after Thawmoo and Sommerville, on behalf of LLHK, made the initial request for disability accommodation and evaluation.  The delay in providing required evaluation, and lack of accommodations during this period, impaired LLHK's academic development, academic progress, and timeline for graduation.

130.    The City of Saint Paul Human Rights Division concluded that the School District's behavior was discriminatory on the basis of national origin and disability.  (Ex. A, MOF, Page 38 of 39.)

2.     **The School District's Refusal to Address its Discriminatory Disability Services**

131.    While the School District claims that it does not have a policy that specifically prohibits special education testing for ELL students, it has been widely observed that it is very difficult for ELL students to be tested for special education until the student's third or fourth *year* in the country.

132.    Like LLHK, other ELL students also face excessive delays, noticeably longer than mainstream students, in obtaining special education evaluations and accommodations.  This is true even if the student's disability is obvious.  In one example cited by the City of Saint Paul, a vision impaired ELL student waited nine months before receiving an Individualized Education Plan ("IEP").  While this student was waiting for the IEP, the student had to stand inches from the board to see what was written.  Similarly, a hearing-impaired ELL student had to wait 16 months to receive an IEP.  Another student had serious behavioral issues suggesting a developmental delay.  When the student was referred for a special education evaluation, his behavior was described as "[refugee] camp" behavior and not related to a disability.  The student stayed in the classroom the entire year before his parents transferred him to another school, where he was ultimately evaluated for and diagnosed with a disability and received special education services.  (Ex. A, MOF, Pages 12 and 21 of 39.)

133.    At an April 16, 2015, PIC meeting, teachers specifically reported concerns about the delays ELL students experienced in being referred for special education. School District staff informed teachers that they would not consider ELL students for

special education, that too many ELL students were being referred, and that students need

to be in the country for three years before they could be referred for special education.

Teachers reported that ELL students with medical diagnoses were not receiving special

education services. Teachers gave examples of students with traumatic brain injuries or

developmental delays that were told they do not qualify for services.  They gave

examples of students with clear developmental delays and diagnoses waiting 15 months

for services.  When parents requested ELL services for a child that had a rock dropped on

his head, they were told to take him to the doctor.  (Ex. A, MOF, Page 28 of 39.)

134.    As the City of Saint Paul summarized:

> The Professional Issues Committee discussed numerous cases
> where even students with apparent disabilities such as
> developmental delay or vision impairment did not receive
> serves [sic] for 9 to 15 months after beginning school in the
> District.  Enough professionals identified a pattern in the
> delay for special education referrals and evaluations for
> accommodations[] that they asked whether there was a policy
> to delay evaluations for ELL students until they had lived in
> the United States for three years.  Although the district denies
> having such a policy remains in place, the practice of
> delaying evaluations due to ELL status has persisted.  Some
> teachers at the Professional Issues Committee meetings
> reported that they were told not to refer ELL students because
> students of color were overrepresented in referrals of students
> of color for disability services.  Although school districts are
> cautioned against mistaking a students' English Language
> Level for a disability, in this case the [School District] failed
> to promptly evaluate valid referrals and requests for ELL
> students because they were ELL students.  U.S. born students
> that were not learning English were not subjected to these
> delays.  This is national origin discrimination in the provision
> of services and prohibited by the Ordinance.

(*Id.*, Pages 34-35 of 39.)

135.    As a result of the School District's discriminatory practices, LLHK and members of the class have been denied, and continue to be denied, access to educational opportunities.  Accordingly, Plaintiffs (other than LLK) have suffered, and continue to suffer, harm as a result of the School District's conduct.

### CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this suit individually and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of all similarly-situated individuals.

137.    Plaintiffs seek to represent an "ELL Class," defined as follows:

> All foreign-born, English Language Learner (ELL) students who attend school within the School District.

138.    Plaintiffs, except LLK, also seek to represent the "Disability Class," defined as follows:

> All foreign-born, English Language Learner (ELL) students who attend school within the School District and who have had a desire expressed on their behalf (such as by a parent, guardian, teacher, or counselor) for an evaluation concerning suspected disability, for disability accommodations, or for special education and related services.

## A.    Rule 23(a)(1): Numerosity

139.    The ELL Class and the Disability Class are each so numerous that individual joinder of all members is impracticable.

140.    According to the School District's website, the School District has more than 39,000 students.  *See* http://www.spps.org/domain/1235 (available as of June 28, 2017).

141.    According to the School District's website, "[a]pproximately 34% of students are English Language Learners."  *See* http://www.spps.org/domain/1235 (available as of June 28, 2017).  According to the School District, over 14,000 students are English Language Learners.

142.    Upon information and belief, the School District has approximately 1,000 SLIFE students.  Upon information and belief, approximately half of the SLIFE students within the School District are Karen.

143.    According to the School District's website, "16% of students require special education services."  *See* http://www.spps.org/domain/1235 (available as of June 28, 2017).  Thus, counting only the students that the School District has already acknowledged, over 6,000 students require special education services.  Upon information and belief, additional students within the School District need to be properly evaluated to determine if they have disabilities such that they need special education and related services.

144.    The exact number of members of each class is not currently known to Plaintiffs but, based on the above, will be thousands of students.

145.    In addition to the large number of students within each of the classes, joinder of the members of the classes would also be impracticable because the proposed class members are foreign-born students who are not proficient in English or familiar with the United States legal system.  In addition, many parents or guardians of ELL students will themselves have limited English proficiency, lack familiarity with the

United States legal system, and lack resources necessary to effectively advocate for their children.

**B.    Rule 23(a)(2): Commonality**

146.    There are questions of law and fact common, respectively, to the ELL Class and to the Disability Class.

147.    With respect to the ELL Class, LLK, LLHK, and all proposed class members are ELL immigrants.  Members of the proposed ELL Class have been or will be adversely affected by the School District's discriminatory and illegal policies in its ELL program.  For example, and without limitation, each member of the ELL Class raises the same fundamental and vital question of law: whether the School District's policies concerning how ELL students are taught violate the law?

148.    Similarly, with respect to the Disability Class, LLHK and all proposed class members are ELL immigrants who also have expressed a desire for potential disability accommodations, special education, and related services.  The School District's improper practices of impeding referrals of ELL students for special education services and delaying evaluations due to ELL status has persisted.  For example, and without limitation, each member of the Disability Class raises the same fundamental and vital question: whether the School District's practices concerning identifying, evaluating, and accommodating ELL students for disabilities violate the law?

149.    Determination of these common questions will turn on an evaluation of the same legal standards, requirements, and policies and practices of the School District.

C.  **Rule 23(a)(3): Typicality**

150.  Plaintiffs' claims are typical of those of the proposed classes.

151.  LLK and LLHK, like the proposed class members, are ELL students. LLHK, like the proposed members of the Disability Class, is a student with a disability. Plaintiffs' claims, like the proposed class members, arise from the School District's improper policies and practices with respect to how it educates ELL students and how it fails to properly identify, locate, evaluate, and accommodate students with disabilities who require special education.  Plaintiffs' claims are based on the same injuries and application of the same legal theories as those of the classes they seek to represent.

152.  All class members will benefit from an end to the School District's illegal, discriminatory, and unconstitutional policies and practices.

D.  **Rule 23(a)(4): Adequacy of Representation**

153.  Plaintiffs will fairly and adequately protect the interests of the classes.

154.  LLK and LLHK are ELL immigrants who were directly harmed by the School District's illegal and discriminatory policies concerning ELL students.

155.  LLHK also has a diagnosed learning disability and has been directly harmed by the School District's systematic failures with respect to ELL students with disabilities.

156.  Plaintiffs have vigorously pursued LLK's and LLHK's rights as ELL students and as a student with a disability.  Indeed, Plaintiffs obtained the extensive Memorandum of Findings from the City of Saint Paul Human Rights Division.  (Ex. A, MOF.)

157.    Plaintiffs seek declaratory and injunctive relief to provide relief to all class members.

158.    Plaintiffs have also retained, on a *pro bono* basis, counsel experienced in handling complex federal class action litigation.  Plaintiffs' counsel are qualified and prepared to pursue this litigation on behalf of the classes.

159.    Plaintiffs and their counsel will vigorously and competently prosecute this action on behalf of the ELL Class and the Disability Class.

**E.    Rule 23(b)(2): Final Injunctive and Declaratory Relief is Appropriate**

160.    Plaintiffs challenge policies and practices by the School District that are generally applicable, respectively, to the ELL Class and the Disability Class as a whole. In particular, the School District is (a) discriminating against and failing to afford equal educational opportunities to its ELL students, and (b) failing to provide appropriate public education to members of the Disability Class by failing to affirmatively identify, locate, evaluate, and accommodate students with disabilities.

161.    The School District has acted or refused to act on grounds that apply generally to the two proposed classes, such that classwide final injunctive and declaratory relief is appropriate.

<u>**CAUSES OF ACTION**</u>

**Count I**
**<u>Violation of the Equal Educational Opportunities Act</u>**
(On Behalf of Plaintiffs and the ELL Class)

162.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

163.    The federal Equal Educational Opportunities Act of 1974 ("EEOA"), 20

U.S.C. § 1703, applies to the School District.

164.    The EEOA provides in pertinent part:

> No State shall deny educational opportunity to an
> individual on account of his or her race, color, sex, or
> national origin, by - … (f) the failure by an educational
> agency to take appropriate action to overcome
> language barriers that impede equal participation by its
> students in its instructional programs.

20 U.S.C. § 1703(f).

165.    National origin discrimination has been defined to include the denial of

equal opportunities due to an individual's, or his or her ancestor's, place of origin, or

because an individual has the physical, cultural, or linguistic characteristics of a national

origin group, including limited English proficiency.

166.    The School District is an educational agency under 20 U.S.C. § 1703(f) and

20 U.S.C. § 1720(a).  Indeed, the EEOA expressly contemplates "local educational

agencies," like the School District, in defining an "educational agency."  *See* 20 U.S.C.

§1720(a).

167.    The EEOA permits a private right of action.  *See* 20 U.S.C. § 1706.

168.    LLK, LLHK, and all members of the ELL Class are foreign-born

immigrants who face language barriers that impede their equal participation in the School

District's instructional programs.

169.    Through its actions and inactions, the School District has failed to take

appropriate action to overcome the language barriers faced by the limited English

41

proficiency students who comprise the ELL Class.  The School District's failure to take

appropriate action to overcome language barriers includes, but is not limited to:

      a.      Placing ELL students in mainstream educational classes that are taught in English that far exceed their English language skills;

      b.      Depriving ELL students of individualized assistance in ELL and mainstream classes they need to develop English proficiency and understanding of the underlying subject matter; and

      c.      Passing or graduating students who read at grade school level English and who are unprepared for post-secondary educational or job opportunities.

170.    Because of the School District's failure to take appropriate action to

overcome their language barriers, LLK, LLHK, and the members of the ELL Class have

been denied equal educational opportunities on account of their national origin.  As a

result, LLK, LLHK, and members of the ELL Class have been denied an appropriate

public education, have been denied the equal opportunity to learn the skills and subject

matter set forth for Minnesota schools, and have been denied the equal opportunity to

reach their full learning and earning potential.

171.    The School District's conduct violates the rights of Plaintiffs and members

of the ELL Class under the EEOA.

172.    As a result of the School District's actions and inactions, Plaintiffs and

members of the ELL Class have suffered and will continue to suffer irreparable harm,

including without limitation the loss of education and instruction time, the inability or

increased difficulty in overcoming language barriers, diminished educational and future

employment opportunities, the loss of time and energy in seeking appropriate education and instruction of ELL students, and the need for prolonged financial support of ELL students due to their diminished educational and future employment opportunities.

173.    Pursuant to the EEOA, Plaintiffs and members of the ELL Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of their rights.

## Count II
## Violation of Title VI of the Civil Rights Act of 1964
### (On Behalf of Plaintiffs and the ELL Class)

174.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

175.    Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

176.    Federal regulations promulgated under Title VI forbid the School District from utilizing methods of administration that subject individuals to discrimination because of national origin or that have the effect of defeating or substantially impairing accomplishment of the objections of the program with respect to individuals of a particular national origin.  *See, e.g.,* 34 C.F.R. §§ 100.3(b)(1)(i)-(vi).

177.    As a recipient of federal funding, the School District is prohibited from discriminating against LLK, LLHK, and the members of the ELL Class, including by

failing to provide appropriate instruction and language services and by providing unequal education services on the basis of national origin.

178.    Title VI permits a private right of action.  *See* 42 U.S.C. § 2000c-8.

179.    The School District has deprived, and continues to deprive, LLK, LLHK, and the members of the ELL Class of their right to an appropriate public education on the basis of their national origin.

180.    The School District has acted intentionally or with deliberate indifference in discriminating against LLK, LLHK, and the members of the ELL Class.  Indeed, midway through a school year and without notifying parents in advance, the School District intentionally chose to mainstream ELL students, apparently so these foreign-born immigrants and refugees would not be "coddled."  As a result of the School District's intentional acts, Level 3 ELL students and higher were put into mainstream classes *regardless* of whether the students were ready for mainstream instruction, without adequate support or monitoring.  As a result of the School District's intentional acts, even some Level 1 and Level 2 ELL students were placed in mainstream classes.  As a result of the School District's intentional acts, LLK and LLHK – ELL students then reading at a far lower level – were thrust into mainstream content classes with wholly inadequate support for their limited English proficiency.

181.    As a result of the School District's intentional or deliberate indifference to their educational and language needs, LLK, LLHK, and the members of the ELL Class have been denied an appropriate program of language instruction and access to comprehensible instruction in critical course content areas.

182.    As a result of the School District's intentional or deliberate indifference to their educational and language needs, Plaintiffs and the members of the ELL Class have been deprived of vital and effective communications with their parents or guardians in the parents' or guardians' preferred language and mode of communication to enable meaningful parent participation in education decisions, which further fails to ensure equal access to education opportunities.

183.    As a result of the School District's intentional or deliberate indifference to their educational and language needs, Plaintiffs and the members of the ELL Class have suffered and will continue to suffer irreparable harm, including without limitation the loss of education and instruction time, the inability or increased difficulty in overcoming language barriers, diminished educational and future employment opportunities, the loss of time and energy in seeking appropriate education and instruction of ELL students, and the need for prolonged financial support of ELL students due to their diminished educational and future employment opportunities.

184.    As a result of the School District's intentional or deliberate indifference to educational and language needs of LLK and LLHK, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

185.    Plaintiffs and members of the ELL Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of their rights under Title VI of the Civil Rights Act of 1964.  Plaintiffs, individually, also seek recovery of compensatory damages.

**Count III**
**Violation of the Fourteenth Amendment of the United States Constitution**
(On Behalf of Plaintiffs and the ELL Class)

186.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

187.    The equal protection clause of the Fourteenth Amendment of the United States Constitution provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.

188.    Through its actions and inactions as summarized herein, the School District has acted and continues to act pursuant to a policy and practice to deprive LLK, LLHK, and the members of the ELL Class of the right to equal protection of the laws under the Fourteenth Amendment.  In particular, as alleged in detail herein, the School District acted pursuant to a policy, practice, or custom to deprive these foreign-born immigrants and refugees of an appropriate public education on the basis of their national origin.

189.    The due process clause of the Fourteenth Amendment of the United States Constitution provides that no State "shall … deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend XIV, § 1.

190.    Students in Minnesota are entitled to receive an appropriate public education through the age of 21.  *See* Minn. Stat. § 120A.20, subd. 1.  This statutorily-created right qualifies as a property interest protected by the due process clause of the Fourteenth Amendment.

191.    Through its actions and inactions as summarized herein, the School District has deprived LLK, LLHK, and the members of the ELL Class of their constitutionally-

protected property interest to an appropriate public education without providing them with notice or a meaningful opportunity to be heard, in violation of procedural protections guaranteed by the due process clause. In particular, as alleged in detail herein, the School District deprived these foreign-born immigrants and refugees of an appropriate public education on the basis of their national origin. When Plaintiffs had the opportunity to be heard before the Saint Paul Human Rights Division after the School District had already implemented its improper policies and practices, the Human Rights Division determined in May 2017 that the evidence demonstrated probable cause that the School District was discriminating against LLHK and not providing him with a proper education on the basis of his national origin.

192.    As a result of the School District's violation of their constitutional rights to equal protection and due process, Plaintiffs and the members of the ELL Class have suffered and will continue to suffer irreparable harm, including without limitation the loss of education and instruction time, the inability or increased difficulty in overcoming language barriers, diminished educational and future employment opportunities, the loss of time and energy in seeking appropriate education and instruction of ELL students, and the need for prolonged financial support of ELL students due to their diminished educational and future employment opportunities.

193.    As a result of the School District's violation of their constitutional rights to equal protection and due process, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

194.    The School District is liable for violation of Plaintiffs' and the class members' constitutional rights under 42 U.S.C. § 1983.

195.    Plaintiffs and members of the ELL Class request declaratory and injunctive relief as set forth herein to remedy the School District's violations of their constitutional rights to equal protection and due process.  Plaintiffs, individually, also seek recovery of compensatory damages.

**Count IV**
**<u>Violation of the Saint Paul Human Rights Ordinance</u>**
(On Behalf of Plaintiffs and the ELL Class)

196.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

197.    Section 183.02(9) of the Saint Paul Human Rights Ordinance (the "Ordinance") defines discrimination to include "all unequal treatment of any person by reason of race, creed, religion, color, sex, sexual or affectional orientation, national origin, ancestry, familial status, age, disability, marital status or status with regard to public assistance."  Saint Paul, Minn. Code § 183.02(9).

198.    The Ordinance provides that it is unlawful to discriminate in any manner with respect to access to, or use or benefit from, the services and facilities provided by an education institution.  Saint Paul, Minn. Code § 183.05(1).

199.    The Saint Paul Human Rights Division "interprets the Ordinance to be consistent with applicable federal laws."  (Ex. A, MOF, Page 29 of 39.)

200.    On May 5, 2017, the Saint Paul Human Rights Division concluded that, based on the actions and inactions described herein, "there is probable cause that the

[School District] discriminated against [LLHK] on the basis of his national origin," in violation of the Ordinance.  (Ex. A, MOF, Pages 30-33 of 39.)

201.    The Ordinance permits a private right of action.  *See* Saint Paul, Minn. Code §§ 183.02, 183.202.

202.    Through its actions and inactions as summarized herein, the School District has discriminated against LLK, LLHK, and members of the ELL Class on the basis of national origin with respect to their access to and benefit from appropriate public education.

203.    As a result of the School District's violation of the Ordinance, Plaintiffs and the members of the ELL Class have suffered and will continue to suffer irreparable harm, including without limitation the loss of education and instruction time, the inability or increased difficulty in overcoming language barriers, diminished educational and future employment opportunities, the loss of time and energy in seeking appropriate education and instruction of ELL students, and the need for prolonged financial support of ELL students due to their diminished educational and future employment opportunities.

204.    As a result of the School District's violation of the Ordinance, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

205.    Plaintiffs and members of the ELL Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of the Ordinance. Plaintiffs, individually, also seek recovery of compensatory damages.

**Count V**
**Violation of the Minnesota Human Rights Act**
(On Behalf of Plaintiffs and the ELL Class)

206.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

207.    The Minnesota Human Rights Act provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, national origin, sex, age, marital status, status with regard to public assistance, sexual orientation, or disability, or to fail to ensure physical and program access for disabled persons." Minn. Stat. § 363A.13, subd. 1.

208.    On May 5, 2017, the Saint Paul Human Rights Division, based on the actions and inactions described herein, concluded that "there is probable cause that the [School District] discriminated against [LLHK] on the basis of his national origin." (Ex. A, MOF, Pages 30-33 of 39.)

209.    The Minnesota Human Rights Act authorizes a private right of action. *See* Minn. Stat. §§ 363A.28, 363A.33.

210.    Through its actions and inactions as summarized herein, the School District has discriminated against LLK, LLHK, and the members of the ELL Class on the basis of national origin with respect to their access to and benefit from appropriate public education.

211.    As a result of the School District's violation of the Minnesota Human Rights Act, Plaintiffs and the members of the ELL Class have suffered and will continue

to suffer irreparable harm, including without limitation the loss of education and

instruction time, the inability or increased difficulty in overcoming language barriers,

diminished educational and future employment opportunities, the loss of time and energy

in seeking appropriate education and instruction of ELL students, and the need for

prolonged financial support of ELL students due to their diminished educational and

future employment opportunities.

212.    As a result of the School District's violation of the Minnesota Human

Rights Act, Plaintiffs, including Thawmoo and Sommerville, have also suffered

compensable injuries, entitling Plaintiffs to compensatory damages.

213.    Plaintiffs and members of the ELL Class request declaratory and injunctive

relief as set forth herein to remedy the School District's violation of the Minnesota

Human Rights Act.  Plaintiffs, individually, also seek recovery of compensatory

damages.

### Count VI
### Violation of the Individuals with Disabilities Education Act
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

214.    Plaintiffs reallege and incorporate by reference each of the preceding

paragraphs of this Complaint as if set forth in full herein.

215.    So that all children with disabilities may receive an appropriate public

education, the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 *et seq.*

("IDEA"), provides that school districts have a duty to ensure that:

> All children with disabilities residing in the State …
> regardless of the severity of their disabilities, and who are in
> need of special education and related services, are identified,

located, and evaluated and a practical method is developed to
determine which children with disabilities are currently
receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).

216.    The IDEA defines children with disabilities, in part, as children who

"need[] special education and related services."  20 U.S.C. § 1401(3)(A)(ii).

217.    The IDEA authorizes a private right of action.  *See* 20 U.S.C.

1415(i)(2)(A).

218.    The United States Supreme Court has stated that the school district's "child

find" obligation is of "paramount importance."  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S.

230, 245 (2009).

219.    The IDEA's child find requirement is an affirmative duty on, and the sole

responsibility of, the School District.  The School District *cannot* pass the burden on to

parents or to other educators.

220.    If a parent suspects that his or her child may have a disability, the parent

has the right to request that the School District conduct an evaluation to determine

whether the student has a disability.  *See* 34 C.F.R. Part 104.  The School District's own

policies reflect this right.

221.    Even if a parent does not request an evaluation, the School District still has

an obligation to identify and evaluate all students who are reasonably suspected of having

a disability.

222. On May 5, 2017, the Saint Paul Human Rights Division concluded that there was probable cause that the School District violated the IDEA with respect to LLHK. (Ex. A, MOF, Pages 33-38.)

223. The School District violated the IDEA with respect to LLHK in numerous ways, including:

(a) The School District refused to evaluate LLHK for a disability, instead suggesting that Thawmoo and Sommerville pay for a medical evaluation at their own cost;

(b) The School District significantly and unduly delayed evaluating whether LLHK required special education services or accommodations for a disability;

(c) The School District failed to provide necessary accommodations for LLHK until 14 months after Thawmoo and Sommerville requested accommodations on his behalf, which delayed LLHK's academic progress and timeline for graduation.

224. LLHK is not alone. Other ELL students similarly suffered from significant delays by the School District in evaluating them for disability and ultimately providing proper accommodations for their disability. Indeed, after reviewing the evidence, the Saint Paul Human Rights Division stated that the School District's "practice of delaying evaluations due to ELL status has persisted," that "[s]ome teachers at the Professional Issues Committee meetings reported that they were told not to refer ELL students because students of color were overrepresented," and that the School District "failed to promptly evaluate valid referrals and requests for ELL students because they were ELL students." (Ex. A, MOF, Page 34-35 of 39.)

225.    As a result of the School District's violation of the IDEA, Plaintiffs (other than LLK) and the members of the Disability Class have suffered and will continue to suffer irreparable harm, including without limitation not receiving timely evaluation of diagnosed or suspected disabilities, timely and appropriate accommodations for disabilities, timely development of an appropriate Individualized Education Program, full educational opportunities, timely and appropriate special education and related services, and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

226.    As a result of the School District's violation of the IDEA, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

227.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of the IDEA. Plaintiffs, individually, also seek recovery of compensatory damages.

### Count VII
### Violation of Section 504 of the Rehabilitation Act of 1973
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

228.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

229.    Section 504 of the Rehabilitation Act of 1973 prohibits the School District, which receives federal funds, from discriminating against students based on an individual's disability.  29 U.S.C. § 794(a).

230.    Students with disabilities, like LLHK, are entitled to full and equal

participation in and the benefits of the School District's programs and activities,

including effective methods of making instruction and instructional materials accessible

and free from discrimination under Section 504.  *See* 29 U.S.C. § 794; 34 C.F.R. § 104.4.

231.    On May 5, 2017, the Saint Paul Human Rights Division explicitly found

that LLHK has a qualified disability, stating:

> [LLHK] is a student of eligible age to attend secondary
> school and receive services.  He has been diagnosed with
> Attention Deficit Disorder – Inattentive and Adjustment
> Disorder with Mixed Anxiety/Depression.  This impairment
> substantially limits him in the major life activities of
> concentrating, thinking, learning, and brain functions.  He
> struggles with organization, including organizing and keeping
> track of his assignments, following multi-step instructions,
> and concentrating on tasks.  Therefore, [LLHK] is a student
> with a qualified disability.

(Ex. A, MOF, Page 37 of 39.)

232.    As an individual with a qualified disability, LLHK qualifies for protection

from discrimination pursuant to Section 504.

233.    Section 504 authorizes a private right of action.  *See* 29 U.S.C. § 794a(2).

234.    LLHK was discriminated against based on his disability and was denied the

benefits of a program or activity of the School District.  Indeed, as alleged herein, the

School District initially refused to evaluate him for disability, delayed his eventual

disability evaluation, used the incorrect standard in evaluating whether he was a student

with a disability, did not inform LLHK or his parents (Thawmoo and Sommerville) of

their rights to ensure a timely consideration of the accommodation request, did not

initiate timely accommodations discussions with LLHK's family, and unreasonably failed

to provide him with disability accommodations for over 14 months.

235.    The School District's conduct toward LLHK and other foreign-born ELL

students – as alleged in detail herein – demonstrates bad faith and/or gross misjudgment,

departing substantially from accepted professional judgment, practice, or standards.  It is

bad faith and/or gross misjudgment for the School District to refuse to adhere to its own

policies and federal requirements and to delay the needed and required evaluations and

accommodations to LLHK as alleged herein, resulting in LLHK going without necessary

accommodations for over a year.  It is bad faith and/or gross misjudgment for the School

District to inform teachers in the School District – as reported by the teachers themselves

– that ELL students would not be considered for special education, that too many ELL

students were being referred for special education, and that students need to arbitrarily be

in the United States for a certain number of years before they could be referred for special

education.  It is bad faith and/or gross misjudgment to refuse to provide disability

services for an ELL student on the offensive basis that the student was exhibiting

"[refugee] camp" behavior.  It is bad faith and/or gross misjudgment to make a vision-

impaired ELL student stand inches from the board for months on end before finally

receiving an IEP.  It is bad faith and/or gross misjudgment to make a hearing-impaired

ELL student wait 16 months to receive an IEP.  It is bad faith and/or gross misjudgment

to determine that ELL students with traumatic brain injuries do not qualify for disability

services.  It is bad faith and/or gross misjudgment to make ELL students with clear

developmental delays and diagnoses wait 15 months for services.  It is bad faith and/or

gross misjudgment to tell the parents of an ELL student who had a rock dropped on his head, who sought disability services for their child, to take him to the doctor.

236.    As a result of the School District's violation of Section 504, Plaintiffs (other than LLK) and the members of the Disability Class have suffered and will continue to suffer irreparable harm, including without limitation not receiving timely evaluation of diagnosed or suspected disabilities, timely and appropriate accommodations for disabilities, timely development of an appropriate Individualized Education Program (IEP), full educational opportunities, timely and appropriate special education and related services, and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

237.    As a result of the School District's violation of Section 504, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

238.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of Section 504.  Plaintiffs, individually, also seek recovery of compensatory damages.

**Count VIII**
**Violation of Title II of the Americans with Disabilities Act**
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

239.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

240.    Title II of the Americans with Disabilities Act ("ADA") prohibits the School District from discriminating against students based on an individual's disability. 42 U.S.C. § 12131, *et seq.*

241.    Students with disabilities, like LLHK, are entitled to full and equal enjoyment of and benefit from the services, programs, or activities of the School District, including effective methods of making instruction and instructional materials accessible and free from discrimination under the ADA.  *See* 42 U.S.C. § 12132 *et seq.*

242.    On May 5, 2017, the Saint Paul Human Rights Division explicitly found that LLHK has a qualified disability.  (Ex. A, MOF, Page 37 of 39.)

243.    As an individual with a qualified disability, LLHK qualifies for protection from discrimination pursuant to Title II of the ADA.

244.    The ADA authorizes a private right of action.  *See* 42 U.S.C. § 12133.

245.    LLHK was discriminated against based on his disability and was excluded from participation in or denied the benefits of the School District's services, programs, or activities.  Indeed, as alleged herein, the School District initially refused to evaluate him for disability, delayed his eventual disability evaluation, used the incorrect standard in evaluating whether he was a student with a disability, did not inform LLHK or his parents (Thawmoo and Sommerville) of their rights to ensure a timely consideration of the accommodation request, did not initiate timely accommodations discussions with LLHK's family, and unreasonably failed to provide him with disability accommodations for over 14 months.

246.    The School District's conduct toward LLHK and other foreign-born ELL students – as alleged in detail herein – was bad faith and/or gross misjudgment, departing substantially from accepted professional judgment, practice, or standards.  It is bad faith and/or gross misjudgment for the School District to refuse to adhere to its own policies and federal requirements and to delay the needed and required evaluations and accommodations to LLHK as alleged herein, resulting in LLHK going without necessary accommodations for over a year.  It is bad faith and/or gross misjudgment for teachers in the School District to be informed – as reported by the teachers themselves – that ELL students would not be considered for special education, that too many ELL students were being referred for special education, and that students need to arbitrarily be in the United States for three years before they could be referred for special education.  It is bad faith and/or gross misjudgment to refuse to provide disability services for an ELL student on the offensive basis that the student was exhibiting "[refugee] camp" behavior.  It is bad faith and/or gross misjudgment to make a vision-impaired ELL student stand inches from the board for months on end before finally receiving an IEP.  It is bad faith and/or gross misjudgment to make a hearing-impaired ELL student wait 16 months to receive an IEP. It is bad faith and/or gross misjudgment to determine that ELL students with traumatic brain injuries do not qualify for disability services.  It is bad faith and/or gross misjudgment to make ELL students with clear developmental delays and diagnoses wait 15 months for services.  It is bad faith and/or gross misjudgment to tell the parents of an ELL student who had a rock dropped on his head, who sought disability services for their child, to take him to the doctor.

247.    As a result of the School District's violation of Title II of the ADA, Plaintiffs (other than LLK) and the members of the Disability Class have suffered and will continue to suffer irreparable harm, including without limitation not receiving timely evaluation of diagnosed or suspected disabilities, timely and appropriate accommodations for disabilities, timely development of an appropriate Individualized Education Program, full educational opportunities, timely and appropriate special education and related services, and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

248.    As a result of the School District's violation of Title II of the ADA, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

249.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of Title II of the ADA.  Plaintiffs, individually, also seek recovery of compensatory damages.

### Count IX
### Violation of Title VI of the Civil Rights Act of 1964
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

250.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

251.    Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

252.    Federal regulations promulgated under Title VI forbid the School District from utilizing methods of administration that subject individuals to discrimination because of national origin or that have the effect of defeating or substantially impairing accomplishment of the objections of the program with respect to individuals of a particular national origin. *See, e.g.,* 34 C.F.R. §§ 100.3(b)(1)(i)-(vi).

253.    As a recipient of federal funding, the School District is prohibited from discriminating against LLHK and the members of Disability Class, including by failing to provide appropriate instruction and by providing unequal education services on the basis of national origin.

254.    Title VI permits a private right of action. *See* 42 U.S.C. § 2000c-8.

255.    The School District has deprived, and continues to deprive, LLHK and the members of the Disability Class to disability, special education, or related services on the basis of their national origin. Indeed, on May 5, 2017, the Saint Paul Human Rights Division concluded that the School District discriminated against ELL students based on their national origin by failing to promptly evaluate and provide accommodations to those foreign-born students, stating:

> Although school districts are cautioned against mistaking a[]
> students' English Language Level for a disability, in this case
> the [School District] failed to promptly evaluate valid
> referrals and requests for ELL students because they were
> ELL students. U.S. born students that were not learning
> English were not subjected to these delays. This is national
> origin discrimination in the provision of services ….

(Ex. A, MOF, Pages 34-35 of 39.)

256.    The School District has acted intentionally or with deliberate indifference in discriminating against LLHK and the members of the Disability Class.

257.    As a result of the School District's violation of Title VI of the Civil Rights Act, Plaintiffs (other than LLK) and the members of the Disability Class have suffered and will continue to suffer irreparable harm, including without limitation not receiving timely evaluation of diagnosed or suspected disabilities, timely and appropriate accommodations for disabilities, timely development of an appropriate Individualized Education Program, full educational opportunities, timely and appropriate special education and related services, and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

258.    As a result of the School District's violation of the Title VI of the Civil Rights Act, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

259.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of Title VI of the Civil Rights Act.  Plaintiffs, individually, also seek recovery of compensatory damages.

**Count X**
**Violation of the Saint Paul Human Rights Ordinance**
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

260.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

261.    Section 183.02(9) of the Saint Paul Human Rights Ordinance defines discrimination to include "all unequal treatment of any person by reason of race, creed, religion, color, sex, sexual or affectional orientation, national origin, ancestry, familial status, age, disability, marital status or status with regard to public assistance." Saint Paul, Minn. Code § 183.02(9).

262.    The Ordinance provides that it is unlawful to discriminate in any manner with respect to access to, or use or benefit from, the services and facilities provided by an education institution. Saint Paul, Minn. Code § 183.05(1).

263.    The Saint Paul Human Rights Division "interprets the Ordinance to be consistent with applicable federal laws." (Ex. A, MOF, Page 29 of 39.)

264.    With respect to the Disability Class and the School District's failure to timely and appropriately provide special education services, the School District violated the Ordinance by improperly discriminating based on both (i) national origin, and (ii) disability.

265.    On May 5, 2017, the Saint Paul Human Rights Division concluded that the School District discriminated against ELL students based on their national origin by failing to promptly evaluate and provide accommodations to those foreign-born students, stating:

> Although school districts are cautioned against mistaking a[]
> students' English Language Level for a disability, in this case
> the [School District] failed to promptly evaluate valid
> referrals and requests for ELL students because they were
> ELL students. U.S. born students that were not learning
> English were not subjected to these delays. This is national
> origin discrimination in the provision of services and
> prohibited by the Ordinance.

(Ex. A, MOF, Pages 34-35 of 39.)

266.     In addition, on May 5, 2017, the Saint Paul Human Rights Division also

concluded that the School District discriminated against LLHK by failing to ensure

program access for persons with disabilities. (Ex. A, MOF, Pages 35-38.)

267.     The Ordinance permits a private right of action. *See* Saint Paul, Minn.

Code §§ 183.02, 183.202.

268.     Through its actions and inactions as summarized herein, the School District

has discriminated against LLHK and the members of the Disability Class on the basis of

national origin and/or disability with respect to their access to and benefit from disability,

special education, and related services provided by the School District.

269.     As a result of the School District's violation of the Ordinance, Plaintiffs

(other than LLK) and the members of the Disability Class have suffered and will continue

to suffer irreparable harm, including without limitation not receiving timely evaluation of

diagnosed or suspected disabilities, timely and appropriate accommodations for

disabilities, timely development of an appropriate Individualized Education Program, full

educational opportunities, timely and appropriate special education and related services,

and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

270.    As a result of the School District's violation of the Ordinance, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

271.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of the Ordinance.  Plaintiffs, individually, also seek recovery of compensatory damages.

## Count XI
## Violation of the Minnesota Human Rights Act
(On Behalf of Plaintiffs, except LLK, and the Disability Class)

272.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of this Complaint as if set forth in full herein.

273.    The Minnesota Human Rights Act provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, national origin, sex, age, marital status, status with regard to public assistance, sexual orientation, or disability, or to fail to ensure physical and program access for disabled persons."  Minn. Stat. § 363A.13, subd. 1.

274.    The Minnesota Human Rights Act authorizes a private right of action.  *See* Minn. Stat. §§ 363A.28, 363A.33.

275.    For the same reasons set forth above with respect to the Ordinance, the School District has discriminated against LLHK and the members of the Disability Class

on the basis of national origin and/or disability with respect to their access to and benefit from disability, special education, and related services provided by the School District and by failing to ensure physical and program access for disabled persons.

276.    As a result of the School District's violation of the Minnesota Human Rights Act, Plaintiffs (other than LLK) and the members of the Disability Class have suffered and will continue to suffer irreparable harm, including without limitation not receiving timely evaluation of diagnosed or suspected disabilities, timely and appropriate accommodations for disabilities, timely development of an appropriate Individualized Education Program, full educational opportunities, timely and appropriate special education and related services, and timely and appropriate communications with parents of ELL students concerning their rights and the disability process in a form and language that they understand.

277.    As a result of the School District's violation of the Minnesota Human Rights Act, Plaintiffs, including Thawmoo and Sommerville, have also suffered compensable injuries, entitling Plaintiffs to compensatory damages.

278.    Plaintiffs and members of the Disability Class request declaratory and injunctive relief as set forth herein to remedy the School District's violation of the Minnesota Human Rights Act.  Plaintiffs, individually, also seek recovery of compensatory damages.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Certify the ELL Class and the Disability Class pursuant to Federal Rule of Civil Procedure 23(b)(2).

B.    With respect to Plaintiffs and the ELL Class:

    1.    Enter declaratory relief providing that the School District's actions and inactions, as described in this Complaint or proven at trial, violate (i) the EEOA, (ii) Title VI of the Civil Rights Act of 1964, (iii) the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution, (iv) the Saint Paul Human Rights Ordinance, and (v) the Minnesota Human Rights Act;

    2.    Enter preliminary and permanent injunctive relief enjoining the School District as follows:

        a.    Cease violating applicable federal, state, and local laws, including implementing recommendations from state and local agencies;

        b.    Cease "mainstreaming" ELL students until each student is individually determined to be ready to appropriately participate in each such "mainstream" class, and provide appropriate and consistent support for ELL students upon their entry into mainstream classes;

        c.    Immediately provide and implement an appropriate, research-based ELL model that provides full servicing to ELL students as required by law and publicize the new model to class members in a language and form of communication that they understand. Upon information and belief, Plaintiffs state that such a program may include, but is not limited to, the following features:

- Offer ELL courses and individual support through ACCESS Level 5, which will include at least Levels 1, 1.5, 2, 2.5, 3, 4, and 5;

- Provide ELL courses consistently and equitably in all schools that will not be dependent on school leadership or budgetary concerns;

- Build master schedules at schools around ELL needs;

- Designate ELL counselors at each school;

      &bull;     Limit ELL courses to a maximum of 20 students per class for Levels 1-2 and 30 students per class for Levels 3-5; and

      &bull;     Formally evaluate the effectiveness of the ELL program using an expert in research-based ELL pedagogy on a regular basis;

d.    Recognize the existence of SLIFE students and provide full and appropriate steps to fully service those students as required by law. Upon information and belief, Plaintiffs state that such steps may include, but are not limited to, the following:

      &bull;     Offer SLIFE students the option of a six-year graduation path, effective immediately;

      &bull;     Designate a qualified SLIFE coordinator, who has appropriate ELL licensure and who has experience working with SLIFE populations;

      &bull;     Implement curriculum designed for SLIFE students;

      &bull;     Implement an intensive ELL program for SLIFE students;

      &bull;     Offer SLIFE students courses relating to study skills, college and career readiness;

      &bull;     Partner secondary schools with the Career & College Readiness office to create a transition program for SLIFE students; and

      &bull;     Provide mandatory SLIFE professional development for mainstream teachers, counselors, special education staff, and administration, which would include identification of trauma in the ELL population;

e.    Involve families of ELL students in ELL programming decisions and communicate with such families in a clear, consistent, and transparent manner. Upon information and belief, Plaintiffs state that this may include, but is not limited to, the following:

- Ensure that any changes to ELL programming will first be discussed with parents of ELL students, with feedback solicited at least one year prior to implementation of such change;

- Ensure that ELL counselors meet with parents of ELL students at the beginning of each school year and at least twice per academic year; and

- Ensure that communications with parents of ELL students are in a form and language that they understand, including in the parents' native language as necessary;

  f. Provide supplemental educational services to remedy the deprivation of a meaningful education caused by the School District's unlawful actions and inactions, including providing targeted services to individual class members, without additional out-of-pocket expenses.

C. With respect to Plaintiffs (except LLK) and the Disability Class:

  1. Enter declaratory relief providing that the School District's actions and inactions, as described in this Complaint or proven at trial, violate (i) the IDEA, (ii) Section 504 of the Rehabilitation Act of 1973, (iii) Title II of the Americans with Disabilities Act, (iv) Title VI of the Civil Rights Act of 1964, (v) the Saint Paul Human Rights Ordinance, and (vi) the Minnesota Human Rights Act;

  2. Enter preliminary and permanent injunctive relief enjoining the School District as follows:

    a. Cease violating applicable federal, state, and local laws;

    b. Cease discriminating against ELL students who are members of the Disability Class based on their national origin or disability as it pertains to the provision of the School District's special education and related services;

    c. Immediately and timely provide all required evaluations, accommodations, special education services, and related services to ELL students who are members of the Disability Class; and

      d.    Ensure that communications with parents of ELL students who are members of the Disability Class concerning their rights and the disability process are in a form and language that they understand, including in the parents' native language as necessary.

D.    Award full compensatory damages to Plaintiffs for their causes of action that seek recovery of compensatory damages, in an amount to be determined at trial.

E.    Award Plaintiffs reasonable attorneys' fees, costs, and disbursements pursuant to all applicable laws or rules, including without limitation 42 U.S.C. § 1988, 29 U.S.C. § 794a(b), 42 U.S.C. § 2000e-5(k), and Minn. Stat. § 363A.33 subd. 7.

F.    Appoint Plaintiffs' counsel to monitor the School District's implementation of the injunctive relief entered by this Court.

G.    Retain jurisdiction over this matter until such time as the School District demonstrates full and ongoing compliance with applicable federal, state, and local laws.

H.    Grant such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Respectfully submitted,

Dated:  July 14, 2017

*s/ Aron J. Frakes*
Aron J. Frakes (#0396993)
Christopher D. Pham (#0390165)
Anupama D. Sreekanth (#0393417)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
Facsimile:  612.492.7077
afrakes@fredlaw.com
cpham@fredlaw.com
asreekanth@fredlaw.com

61625501

***Attorneys for Plaintiffs***